[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14160
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06012-GAP-TBS


QUALITY AUTO PAINTING CENTER OF ROSELLE, INC.,
Traded as Prestige Auto Body,

                                        Plaintiff-Appellant,

                        versus

STATE FARM INDEMNITY COMPANY,
STATE FARM GUARANTY INSURANCE COMPANY, et al.,

                                        Defendants-Appellees.


_____

No. 15-14162
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06013-GAP-TBS


ULTIMATE COLLISION REPAIR, INC.,

Plaintiff-Appellant,

versus

STATE FARM INDEMNITY COMPANY,
STATE FARM GUARANTY INSURANCE COMPANY, et al.,

Defendants-Appellees.

_____

No. 15-14178
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06018-GAP-TBS

CAMPBELL COUNTY AUTO BODY, INC.,

Plaintiff-Appellant,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al.,

Defendants-Appellees.

_____

No. 15-14179
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,

6:14-cv-06019-GAP-TBS

LEE PAPPAS BODY SHOP, INC.,
DAVID C. BROSIUS,
d.b.a. Martins Auto Body Works, Inc.,
ART WALKER AUTO SERVICES, INC.,
WHITEFORD COLLISION AND REFINISHING, INC.,

Plaintiffs-Appellants,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al,

Defendants-Appellees.

_____

No. 15-14180
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:15-cv-06022-GAP-TBS

CONCORD AUTO BODY, INC.,

Plaintiff-Appellant,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al,

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 4, 2019)

Before ED CARNES, Chief Judge, TJOFLAT, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, NEWSOM, BRANCH, and ANDERSON,[*] Circuit Judges.[**]

ANDERSON, Circuit Judge:

This antitrust case requires us to apply the standards announced in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), to determine whether the allegations of the five complaints before us are sufficient to "nudge[] their claims across the line from conceivable to plausible," id. at 570, 127 S. Ct. at 1974, so as to state a claim under § 1 of the Sherman Act. Plaintiff-Appellant automobile repair shops (the "Body Shops") claim that the Defendant-Appellee Insurance Companies colluded to lower repair prices by improperly pressuring the shops to lower prices and by threatening to boycott those who do not comply. The Body Shops claim a per se price-fixing conspiracy and a per se conspiracy to boycott. They also bring several state law claims.

---

[*] Senior Judge R. Lanier Anderson elected to participate in this decision pursuant to 28 U.S.C. § 46(c).
[**]  Judges Marcus, Rosenbaum, and Jill Pryor are recused. Judge Britt Grant joined the Court on August 7, 2018, and did not participate in these en banc proceedings.

# I. BACKGROUND

The cost of repairing a damaged vehicle is primarily based on labor and material costs. Repair shops can consult estimating guides to assist in calculating their labor rates but there is no standard way of determining a shop's labor rate. Within the category of labor costs, variables such as overhead, shop size and capacity, repair volume, and expertise affect each shop's rate. Market considerations, such as the prevailing labor rates within the geographic area of the shop, can dominate that cost. Material costs are driven by the cost of repairing or replacing damaged parts. Parts can be sourced from the original manufacturer, an aftermarket company, a salvage yard, or a parts refurbisher. Alfred M. Thomas & Michael Jund, Collision Repair and Refinishing: A Foundation Course for Technicians 7 (2014).

The Body Shops are a group of professional automobile repair companies that provide collision repair services to individuals insured by the Insurance Companies. Accepting the factual allegations in the complaint[1] as true and construing them in the light most favorable to the plaintiff—as required by the Fed. R. Civ. P. 12(b)(6) posture of this case—the Body Shops derive seventy to ninety-

---

[1] Because this appeal is a consolidation of five separate cases, there are five separate complaints in the record. The parties agree that the five complaints are "nearly identical," En Banc Br. of Body Shops, at 6 n.1, and that the complaint in the lead case, Quality Auto Painting Center v. State Farm, No. 15-14160, is representative. Accordingly, unless otherwise noted, citations to a complaint in this opinion are to paragraphs of that complaint.

five percent of their revenue from customers who pay via insurance and the Insurance Companies account for sixty-five to eighty-five percent of the insurance market in each of the relevant states. The Body Shops broadly allege that the Insurance Companies—with Defendant-Appellee State Farm as their leader—have combined or conspired to depress the amounts they pay for auto repairs performed on behalf of their insureds. According to the Body Shops, the Insurance Companies accomplish this in a number of ways.

First, the Body Shops allege that each of the Insurance Companies use a formal agreement system called "direct repair programs" or "DRPs."[2] In exchange for entering into a DRP, the several Insurance Companies each agrees to list a shop as a "preferred provider" for its insureds which, at least in theory, generates increased business for the shop. In return, the shop agrees to certain concessions regarding, among other things, the "market rate" at which they are entitled to be reimbursed for labor costs. State Farm sets its market rate using an electronic survey of the shops in a particular geographic area and advises the Body Shops that they will pay no more than the market rate. In addition, the other Insurance Companies advise the Body Shops that they will pay no more than State Farm.

---

[2] Each of the Insurance Companies who use DRPs has a unique name for their specific program. However, the term "DRP" appears to be widely used in the industry and, in any event, the parties here appear to prefer its usage when describing these programs generally.

The Body Shops allege, primarily, that the survey is methodologically unsound,[3] that State Farm manipulates the survey to achieve an artificial rate, that State Farm will contact a shop and demand that they lower their rates, that State Farm will threaten—and effectuate—removal from the "preferred providers" list if a shop attempts to raise its rate, and that State Farm attempts to prohibit discussions among repair shops about their rates on the theory that such discussions constitute illegal price-fixing. The Body Shops allege that the market rate is enforced even against those shops which are not signatories to a DRP.[4]

Additionally, the Body Shops allege that the Insurance Companies have combined or conspired to depress the amounts they pay for replacement parts on damaged vehicles. According to the Body Shops, the Insurance Companies refuse to pay for "original equipment manufacturer" parts, which—because they are designed by the car manufacturer to fit the precise make and model of the damaged car—are more expensive. Rather, the Body Shops are required to use either "aftermarket" parts designed by third-parties or "salvaged" parts from other wrecked vehicles. These parts require extra time to install—which the Insurance

---

[3]     The survey sets the market rate just slightly above the rate offered by the median "technician or work bay" in the relevant area when those rates are listed from lowest to highest. The Body Shops assert that this is an invalid means of determining the rate because it does not take into account the variances in shop size, skill of technicians, and other quality variables, and that State Farm alters the shops' labor rates arbitrarily.

[4]     None of the Body Shops here are currently a party to a DRP, and only one has apparently ever been. That relationship ended approximately one year before this action was filed.

7

Companies do not pay for—and cannot be guaranteed as safe by the Body Shops. The Insurance Companies also allegedly: utilize industry-standard databases[5]— which identify "target" costs for certain repairs—only when financially advantageous to them; often refuse to pay for necessary repairs; routinely refuse to reimburse the cost of certain materials; mandate participation in their parts procurement process; and force discount programs on the Body Shops. The Body Shops argue that these actions constitute a per se price-fixing violation of the Sherman Act.

Lastly, the Body Shops allege that the Insurance Companies engage in a practice known as "steering," in which they discourage their insureds from patronizing a noncompliant repair shop through "misrepresentation, insinuation, and casting aspersions." These practices allegedly include telling insureds that a particular repair shop: is not on the preferred provider list; has had quality control issues; charges more than other shops in the area (and that they will not pay the excess amount); takes longer than other shops (and that they will not pay for additional car rental days); and does not perform work that can be guaranteed by the Insurance Companies, even though the Insurance Companies never guarantee

---

[5] According to the complaint, there are three leading collision repair estimating databases—ADP, CCC, and Mitchell—which "provide software and average costs associated with particularized types of repairs to create estimates." Compl. ¶¶ 65-66. The databases generate estimates that include "the ordinary and customary repairs, repair time (labor) and materials to return a vehicle to its pre-accident condition," and are considered reliable starting points. Id. at ¶ 66.

any repair work. The Body Shops argue that the Insurance Companies conspire with respect to such steering, constituting a per se group boycott.

The Body Shops filed approximately twenty-two similar lawsuits in federal district courts throughout the country.[6] The Judicial Panel on Multidistrict Litigation transferred all of the actions to the Middle District of Florida (Judge Presnell) where the "lead case," A&E Auto Body, Inc. v. 21st Century Centennial Insurance Co., No. 6:14-cv-310, was already pending. Of the twenty-two actions: two—the lead case and one other—were dismissed with prejudice[7] and not appealed; four were dismissed and are currently on appeal; and two were dismissed by the district court and then also had their appeals dismissed for lack of prosecution. Of the remaining fourteen, five are the subject of this appeal.

---

[6] The parties' filings and the district court's orders are less than clear about the total number of cases involved in this multidistrict litigation. It appears that there were, at one point, twenty-four independent causes of action with regard to this litigation: the twenty-two discussed above; a RICO class action that was filed in Illinois, was transferred to the Middle District of Florida, and is still currently pending; and a state consumer protection action filed by the State of Louisiana in Louisiana state court, removed to federal court in Louisiana by the Insurance Companies, transferred to the Middle District of Florida, and then remanded to Louisiana state court by the district court.

[7] The initial complaint in the lead case was dismissed without prejudice "on the grounds that it was a prohibited 'shotgun' pleading, that it failed to properly set forth the basis for [the district c]ourt's jurisdiction, that it failed to identify which parties had ongoing contracts with one another, and that all of the allegations of wrongdoing were attributed, collectively, to every [Insurance Company], even where such collective attribution made no sense." A&E Auto Body, 2015 WL 5604786, at *1 (M.D. Fla. Sept. 23, 2015). The Body Shops filed an amended complaint and the district court dismissed one claim with prejudice and the remainder of the claims without prejudice once again. Id. Finally, the district court dismissed all the claims from the second amended complaint with prejudice, noting that "[d]espite becoming much wordier, the Plaintiffs' pleadings have not come remotely close to satisfying the minimum pleading requirements as to any of the claims asserted." Id. at *12.

As relevant to this appeal, the Body Shops alleged two violations of federal law under the Sherman Act, 15 U.S.C. § 1, for price-fixing and group boycotting. They also alleged three causes of action under the laws of the state in which the suits were filed for unjust enrichment, quantum meruit, and tortious interference[8] (collectively, the "State Law Claims").[9] The Insurance Companies moved to dismiss all fourteen cases, the Body Shops filed a consolidated response to which the Insurance Companies replied, and the district court referred the matter to a magistrate judge for a report and recommendation.

Pursuant to that referral, the magistrate judge entered a fifty-nine page Report and Recommendation (the "R&R"), which concluded that the relevant claims should be dismissed without prejudice. The Body Shops then filed an Omnibus Objection to the R&R (the "Objection"), wherein they challenged the magistrate judge's conclusions with respect to some of their claims. The district court overruled the Body Shops' objections to the R&R, adopted the R&R, and

---

[8] In New Jersey the correct label for this cause of action is "tortious interference with prospective economic advantage;" in Kentucky and Missouri it is "tortious interference with business relations;" and in Virginia it is "tortious interference with a business relationship."

[9] The Body Shops alleged additional violations of state law founded on theories of quasi-estoppel, equitable estoppel, conversion, state antitrust statutes, and state consumer protection statutes—all of which were dismissed. The Body Shops did not challenge the dismissal of those claims and they are thus abandoned on appeal. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (holding that issues not raised on appeal are deemed waived).

dismissed all of the relevant claims without prejudice (the "Dismissal Order").[10] Rather than file amended complaints, the Body Shops appealed the district court's decision with respect to five of the initial actions—two that were filed in New Jersey and one each from Kentucky, Missouri, and Virginia. Those five actions were consolidated on appeal. A divided panel of this Court reversed the district court's decision, holding that the Body Shops had alleged sufficient allegations to survive a motion to dismiss on all of the claims. That decision was vacated when this Court voted to hear the case en banc.[11]

## II. ISSUES ON APPEAL

The parties were instructed to brief the en banc court on the following issues:

1)    Can a <u>per se</u> illegal price-fixing agreement or conspiracy between and among the several defendant-Insurance Companies plausibly be inferred from the allegations of the complaints in the several cases before this Court.

2)    Can a <u>per se</u> illegal agreement or conspiracy between and among the several defendant-Insurance Companies to boycott the plaintiffs' Body Shops plausibly be

---

[10]    An identical R&R, Objection, and Dismissal Order was filed in each of the cases present on appeal.

[11]    We recognize the tremendous effort that the district court expended in handling a multidistrict litigation of this scale.

inferred from the allegations of the complaints in the several cases before this Court.

The parties also briefed the state law issues involving the three state law claims—unjust enrichment, quantum meruit, and tortious interference. We address first the federal antitrust claims, including the alleged price-fixing conspiracy and the alleged group boycott, and then the state law claims.

## III. STANDARD OF REVIEW

We review a district court's dismissal of a complaint with prejudice for failure to state a claim de novo. Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1288 (11th Cir. 2010). While we accept the factual allegations in the complaint as true, construing them in the light most favorable to the plaintiff, the allegations must state a claim for relief that is plausible, not merely possible. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949.

IV. FEDERAL ANTITRUST CLAIMS

A. The Legal Landscape

Section One of the Sherman Act, under which both the price-fixing and boycotting claims are brought, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In addition to that bare bones recital of prohibited behavior, the Supreme Court has long concluded that Congress intended only to prohibit "unreasonable" restraints on trade. See, e.g., Arizona v. Maricopa Cty. Med. Soc., 457 U.S. 332, 343, 102 S. Ct. 2466, 2472–73 (1982). Thus, § 1 prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1071 (11th Cir. 2004). Only the first element is at issue on this appeal.[12]

Therefore, because the Body Shops are required to allege facts plausibly suggesting a conspiracy, "the crucial question is whether the challenged

---

[12] Regarding the second element, certain behaviors have been held to be so "plainly anticompetitive," National Society of Professional Engineers v. United States, 435 U.S. 679, 692, 98 S. Ct. 1355, 1365 (1978), and to so often "lack . . . any redeeming virtue," North Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 518 (1958), that they are conclusively presumed to be unreasonable, Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 8, 99 S. Ct. 1551, 1557 (1979). Horizontal price-fixing and group boycotts—the two alleged violations here—often, if not always, fall into this category of "per se" violations. In light of our disposition, we need not address Geico's argument that the per se analysis should not apply to the context of insurance companies reimbursing their insureds for the companies' obligation to pay a body shop for vehicle repairs.

anticompetitive conduct stems from independent decision or from an agreement, tacit or express." Twombly, 550 U.S. at 554, 127 S. Ct. at 1964.  As in this case, the Supreme Court in Twombly was confronted with "the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act." Id. at 555–56, 127 S. Ct. at 1964.  In applying the general standards applicable under Fed. R. Civ. P. 8 to a § 1 claim, the Supreme Court held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Id. at 556, 127 S. Ct. at 1965.  The Court recognized that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 556, 127 S. Ct. at 1965.  The Court held:

> While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establishing agreement or . . . itself constituting a Sherman Act offense." Theatre Enterprises[, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537] at 540–541, 74 S. Ct. 257 [(1954)]. Even "conscious parallelism," a common reaction of "firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L.Ed.2d 168 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1) . . .

14

The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. . . . [P]roof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action . . . . [C]onspiracy evidence must tend to rule out the possibility that the defendants were acting independently.

Id. at 553-54, 127 S. Ct. at 1964 (alterations in original removed).

Even before Twombly, "it [was] well settled in this circuit that evidence of conscious parallelism alone does not permit an inference of conspiracy unless the plaintiff either establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest, or offers other 'plus factors' tending to establish that the defendants were . . . in a collusive agreement to fix prices or otherwise restrain trade." City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 571 (11th Cir. 1999) (internal quotations, changes, and footnotes omitted). As this Court has noted, these plus factors "remove [a plaintiff's] evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism." Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1301 (11th Cir. 2003).

Conclusory allegations of agreement or conspiracy are insufficient. As the Court held in Twombly:

[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some

15

unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. at 556-57, 127 S. Ct. at 1966. The plaintiff has the obligation to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555, 127 S. Ct. at 1964-65.

We address first the Body Shops' claim of horizontal price-fixing conspiracy, and then turn to their claim of horizontal boycotting conspiracy. As noted above, both claims require that the Plaintiffs allege facts supporting an agreement or conspiracy among the Insurance Companies.

B. Horizontal Price-Fixing Conspiracy

At the outset, we address an issue regarding the complaints. The first is merely an observation of the time-worn principle that it is only the factual allegations contained therein which we must accept as true. The Body Shops' appellate briefing takes undue liberties in construing the inferences that can be fairly read from their pleadings. The district court dismissed these claims without prejudice and, therefore, the Body Shops had an opportunity to amend their complaints to include any additional allegations that may have been omitted from their initial pleadings. Having chosen not to do so, they are not permitted to simply "insert" new allegations through their appellate briefing. These gaps—

16

between the allegations of the complaints and the allegations of the appellate briefing—are discussed, where relevant, below.[13]

The Body Shops identify several purported plus factors that they contend—in conjunction with their allegations of parallel conduct—warrant an inference of a per se horizontal price-fixing conspiracy. We discuss each[14] of their purported plus factors in turn.[15]

---

[13]    In the briefing instructions for the en banc briefs, the Body Shops were instructed to "identify the allegations [of the complaints] from which such an agreement or conspiracy can plausibly be inferred and discuss whether any asserted inference of agreement or conspiracy is 'just as much in line with a wide swath of rational competitive business strategy prompted by common perceptions of the market . . . or whether such inference is supported by allegations tending to rule out the possibility that the defendants were acting independently.'" Reluctantly, we cannot conclude that the en banc brief of the Body Shops complied with that directive. Although their brief lists numerous statements that it asserts are "specific allegations of conduct that probably do not result from . . . independent responses to common stimuli," many have no tendency to suggest an advance agreement among the insurance companies, and are thus simply irrelevant. As indicated in this opinion, others reflect facts that are simply not pled in the complaints and not reasonably inferred from the actual allegations. We also discuss in this opinion those allegations with respect to actions just as much in line with a wide swath of rational competitive business strategy and thus cannot qualify as the plus factors required for a viable claim.

[14]    Two can be rejected outright. The Body Shops argue that they asserted "specific allegations of conduct that indicate the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." However, despite arguing in their brief that representatives from non-State Farm Defendants have stated that they are restricted from altering the purported market rate unless authorized by State Farm, that allegation is nowhere to be found in the complaints. Quite the contrary, the only relevant specific allegation of fact is that the non-State Farm Insurance Companies advise the Plaintiffs that they will pay no more than State Farm pays—i.e., mere price leadership as discussed below.

The Body Shops also argue that the conspiracy is shown by the presence of a common motive, namely desire to maximize profits. However, under this logic, most businesses with similar pricing would be deemed in cahoots with each other because that is the goal of most corporations. This plus factor is more properly invoked in contexts where the motive is unique and specific to the alleged conspirators. See, e.g., Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co., 817 F.2d 639, 647 (10th Cir. 1987) (company exerted influence on municipality in favor of monopolist as part of agreement to avoid monopolist challenging it in another market); see also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434c, at 276-77 (4th ed.

*1. Uniformity of Price*

The Body Shops argue in their brief that the Insurance Companies' conduct does "not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" because they have "adopt[ed] a uniform price despite variables that would ordinarily result in divergent prices."  This asserted plus factor consists of two components. First, the defendants must have adopted a uniform price.  This component, however, is suggestive only of parallel conduct and, without more, will not justify invoking the plus factor.  Accordingly, the uniform price must exist "despite variables that would ordinarily result in divergent pricing."  The second component is an indicator of the agreement that makes collusion more plausible than conscious parallelism, thus moving the needle off of equipoise.

The sources on which the Body Shops rely make clear the necessity of both components.  In <u>Federal Trade Commission v. Cement Institute</u>, 333 U.S. 683,

---

2017), ¶ 1434c, at 276-77 (discussing how motivation can, in some cases, merely restate interdependence).

[15]     In considering each plus factor, we are cognizant of the Supreme Court's admonition that antitrust plaintiffs receive "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." <u>Cont'l Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690, 699, 82 S. Ct. 1404, 1410 (1962).  At the same time, it is undoubtedly our responsibility "to evaluate the evidence proffered by the plaintiffs not to ascertain its credibility, but instead to determine whether that evidence, if credited, 'tends to' establish a conspiracy more than it indicates conscious parallelism." <u>Williamson Oil</u>, 346 F.3d at 1301.

713, 68 S. Ct. 793, 809 (1948), the Supreme Court inferred an agreement where "for many years, with rare exceptions, cement has been offered for sale in every given locality at identical prices and terms by all producers."  But the record evidence in that case established that "[t]housands of secret sealed bids ha[d] been received by public agencies which corresponded in prices of cement down to a fractional part of a penny." 333 U.S. at 713, 68 S. Ct. at 809.  Likewise, the Body Shops quote a leading antitrust treatise for the idea that an agreement may be present if rivals establish identical prices, but they fail to grapple with the caveat that this is only true where there are "simultaneous identical bids on a made-to-order product not readily assembled from standard and conventionally priced items."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434b (3d ed. 2012).[16]  Thus, while this so-called convergent pricing certainly is—or at least could be—a plus factor, it should only be invoked where we should otherwise expect divergent pricing.  Considered in the appropriate light, the differences between the instant case and the case on which the Body Shops rely are substantial.

First, the focus in Cement Institute on "secret," "sealed," and "simultaneous" bids is crucial precisely because that is what takes the situation beyond that of mere conscious parallelism: competitors cannot consciously parallel one another if they only learn of the other's price after they have established their own.  Perhaps

---

[16]     Both Twombly and the Appellants quote from earlier editions of Areeda and Hovenkamp's Antitrust Law.  However, we use the fourth edition of that treatise.

19

sensing this, the Body Shops' brief argues that all of the Insurance Companies employ the same, identical "market rate" which State Farm does not make public. As an initial matter, alleging that State Farm does not publicly disclose the market rate and arguing that it is a secret are two very different things. The fact that State Farm does not issue a press release with the market rate does not foreclose the possibility that it is publicly known. This is a crucial distinction.

There are no factual allegations that the market rate is a secret. Indeed, nowhere in the complaints do the Body Shops suggest that the labor rate is a secret. Quite the opposite, the complaints reveal that State Farm must necessarily tell the rate to every repair shop in a given geographic area.

Even if it were possible to share the market rate with the Body Shops while, at the same time, keeping it a secret from the other Insurance Companies, there are no allegations at all that the other Insurance Companies knew what it was in advance. Indeed, rather than allege that all of the Insurance Companies simultaneously approached the Body Shops with an identical market rate (which might possibly indicate that they had communicated in advance), the complaints allege that the other Insurance Companies simply conform to State Farm's rate— whatever that may be. Compl. ¶ 62 ("Defendants . . . specifically advised the Plaintiff they will pay no more than State Farm pays for labor."); Compl. ¶ 115 ("[D]efendants [state] that they will conform to State Farm's payment structure.").

Following the example set by a competitor, without agreeing to do so in advance, is textbook "price leadership"—a practice we have repeatedly stated is insufficient to establish the existence of an agreement. See, e.g., Williamson Oil, 346 F.3d at 1301-03 ("It is well settled in this circuit that evidence of conscious parallelism alone does not permit an inference of conspiracy unless the plaintiff either establishes that . . . each defendant engaging in the parallel action acted contrary to its economic self-interest, or offers other 'plus factors' tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices") (internal punctuation and citations omitted); City of Tuscaloosa, 158 F.3d at 571 ("[C]onsciously parallel behavior by oligopolists does not in itself support an inference of agreement, of 'a meeting of the minds,' any more strongly than it supports an inference of legal price maintenance or leadership.").  Price leadership is comprehensively described in the leading antitrust treatise:

> The first firm in a five-firm oligopoly, Alpha, may be eager to lower its price somewhat in order to expand its sales. However, it knows that the other four firms would probably respond to a price cut by reducing their prices to maintain their previous market shares. Unless Alpha believes that it can conceal its price reduction for a time or otherwise gain a substantial advantage from being the first to move, the price reduction would merely reduce Alpha's profits and the profits of the other firms as well.

> Such "oligopolistic rationality" cannot only forestall rivalrous price reductions, it can also provide for price increases through, for example, price leadership. If the price had for some reason been less

than X [the price a monopolist would charge to maximize profits], firm Beta might announce its decision to raise its price to X effective immediately, or in several days, or next season. The other four firms may each choose to follow Beta's lead; if they do not increase their prices to Beta's level, Beta may be forced to reduce its price to their level. Because each of the other firms knows this, each will consider whether it is better off when all are charging the old price or price X. They will obviously choose X when they believe that it will maximize industry profits.

Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1429b (4th ed. 2017).[17]

With respect to interdependent parallelism like price leadership, the treatise notes: "The courts are nearly unanimous in saying that mere interdependent parallelism does not establish contract, combination, or conspiracy required by Sherman Act §1." <u>Id.</u> ¶ 1433a. This follows from the Supreme Court's holding in <u>Twombly</u>: "Even 'conscious parallelism,' a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." 550 U.S. at 553-54, 127 S. Ct. at 1964 (internal quotations and punctuation omitted).

Further distinguishing our case is the fact that auto body repairs are not the type of "made-to-order product not readily assembled from standard and conventionally priced items" where we expect to see divergent pricing. On the contrary, the "products" here—cars—are so readily assembled from standard parts that their assembly-line manufacturing set the standard for other industries. That

---

[17] Hereinafter cited as Areeda and Hovenkamp.

the Body Shops are repairing those cars, rather than assembling them for the first time, does not make the parts used to do so any less standard. And they are so conventionally priced that, as discussed below, the Body Shops believe that the Insurance Companies should not be allowed to deviate from third-party databases that set standardized prices. Indeed, these industry databases not only indicate standardized pricing for parts, but they also estimate repair time (labor) for particular types of repairs which are ordinary and customary repairs. Thus, while convergent pricing where it should otherwise not be expected can undoubtedly serve as a plus factor, none of the indicators to which courts and commentators have traditionally looked to support such a factor—or at least none to which the Body Shops have pointed and none that we can perceive—are present here.

The Body Shops have not pointed to any plausible reason that one should expect that prices in this market—involving standardized automobile parts and repairs—would be divergent. Quite the contrary, the Body Shops argue that the Insurance Companies should comply with several databases that exist for the sole purpose of establishing standardized pricing. That is, the fact that the Body Shops insist that the Insurance Companies should comply with the prices published in these three separate databases demonstrates that such prices are standardized, and that one should expect convergent prices—not divergent prices.

In short, the instant case bears none of the traditional hallmarks of a situation in which uniform pricing is present in an industry where we would otherwise not expect it. Nor are any of the other reasons offered by the Body Shops suggestive of an environment in which we would expect to see divergent pricing. And without an expectation of divergent pricing, all that remains is an allegation of uniform pricing, which is indicative only of parallel conduct. Although the complaints repeatedly allege that the insurance companies have agreed and conspired with respect to price, these allegations have no basis in the facts actually alleged. They are merely conclusions and therefore are an insufficient basis on which to infer a prior agreement. Twombly, 550 U.S. at 557, 127 S. Ct. at 1966 ("[A] conclusory allegation of agreement at some unidentified point does not supply the facts adequate to show illegality.").

In this case, the Body Shops' own allegations put a nail in their coffin. Their own allegations explain why there is uniformity in price—the other Insurance Companies simply tell body shops that they will pay no more than State Farm. This is a rational and legitimate business strategy and one which involves clearly legal price leadership. Accordingly, we reject this plus factor as an indicator of the necessary agreement.

## 2. *Uniformity of Tactics*

As its second plus factor, the Body Shops argue that the Insurance Companies have engaged in uniform practices suggestive of an agreement. Several courts have found a plus factor where there is a similarity of language, terms, or conditions used by the alleged co-conspirators that would be improbable absent collusion. See, e.g., De Jong Packing Co. v. U.S. Dep't of Agric., 618 F.2d 1329, 1332–34 (9th Cir. 1980). Although the Body Shops' briefing describes the Insurance Companies' tactics as "the same," "identical," and part of a "script[]," the Body Shops' briefing is betrayed by their complaints, which introduce the relevant tactics as follows:

> Through various methods, the [Insurance Companies] have, independently and in concert, instituted numerous methods of coercing the [Body Shops] into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

Compl. ¶ 63. There is nothing in those allegations to suggest that the Insurance Companies' tactics are uniform or that they use a script.[18] None of the actual allegations of the complaints suggest that language used by the several Insurance Companies was the "same" or "identical" or like a "script." Indeed in none of the five complaints do the words "same," "identical" or "script" appear in reference to

---

[18] As for what else can be said about that allegation, the fact that the Body Shops concede that some of the alleged actions occurred "independently" is certainly noteworthy. And the allegation of concerted action is merely conclusory.

25

the tactics used. Nor is there any other actual allegation that suggests some uniform practice that is somehow idiosyncratic and not to be expected as within the "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Twombly, 550 U.S. at 554, 127 S. Ct. at 1964. Not only is there no allegation of identical or similar language, the language actually used in the complaints suggests just the opposite. As noted, ¶ 63 alleges "[t]hrough various means" and ¶ 64 alleges "[s]ome of these methods"—i.e., phrases that do not suggest that all or a substantial group of the Insurance Companies engage in all or most of the methods in strikingly similar ways.

The Body Shops argue that the Insurance Companies have engaged in uniform tactics in that they require the Body Shops: to repair faulty parts rather than install replacement parts; to install used or recycled parts; and to offer discounts and concessions. Even if there were considerable uniformity with respect to the Insurance Companies' use of such methods, that would be suggestive of an agreement only if such usage would not plausibly arise from "independent responses to common stimuli." See Twombly, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n.4 (quoting Areeda and Hovenkamp ¶ 1425). All of these purported "highly uniform" tactics are easily explained by the most common of corporate stimuli: a desire to increase profits. And while some methods of increasing profits could be so idiosyncratic as to be unlikely to arise in the absence of an agreement, this is

26

plainly not the case here.  None of these tactics could even be fairly described as novel, let alone idiosyncratic, so as to support an inference of an agreement.  It can hardly be denied that repairing (rather than replacing) damaged parts, installing recycled (rather than new) parts, and requiring discounts are among the most common and time-worn methods of increasing corporate profits in any industry, let alone in an industry where parts and labor reimbursements are the primary business expenditures, and where the parts are standardized and most repairs are "ordinary and customary" with industry wide databases that provide standardized estimates.[19]  In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1189 (9th Cir. 2015) ("But plaintiffs' plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market.").  Thus, even if we assume considerable uniformity among the Insurance Companies with respect to requiring where possible the repair of parts (rather than using new), requiring the use of recycled parts (rather than new), and requiring discounts, there would be no basis for inferring a prior agreement because each insurance company would rationally and independently want to do precisely that.  That is, independent action is at least as plausible as concerted action pursuant to prior agreement; thus

---

[19]     As noted above, there are no actual allegations that the Insurance Companies use identical language conveying their instructions to body shops to use recycled parts, etc., nor any other actual allegation of fact suggesting that some uniform practice is somehow idiosyncratic so as to give rise to an inference of advance agreement.

nothing "tends to exclude the possibility of independent action," Twombly, 550 U.S. at 553-54, 126 S. Ct. at 1964, or "remove[s] . . . [this case] from the realm of equipoise and render[s] [this case] more probative of conspiracy than of conscious parallelism," Williamson Oil, 346 F.3d at 1301. Indeed, this is especially true in this case where the complaints repeatedly allege that the several companies say they will "conform to State Farm's payment structure." Compl. ¶ 115.

A complaint merely alleging several common and obvious industry practices should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery. The Supreme Court has described precisely this problem:

> [E]ven if [defendants committed all the acts] in all the ways the plaintiffs allege, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

Twombly, 550 U.S. at 566, 127 S. Ct. at 1971 (citation omitted).

The Body Shops' briefing suggests that the Insurance Companies' tactics are highly uniform when even the complaint does not allege that. Although the Body Shops do allege uniformity of actions, no facts are actually alleged in support of this conclusion. Therefore, the allegation is merely conclusory and insufficient. Id. at 557, 127 S. Ct. at 1966. The Body Shops do not explain which of the

28

challenged activities occurred "in concert" and which occurred "independently." And no facts are actually alleged suggesting concerted action pursuant to a prior agreement. The Body Shops rely upon several alleged tactics which are clearly common, obvious, and mainstream. An inference of prior agreement does not arise from the mere fact that several Insurance Companies adopt policies favoring use of cheaper parts and offering discounts to Insurance Companies. The Body Shops' position is inconsistent with Supreme Court precedent, especially with Twombly, as well as Eleventh Circuit precedent.

Long before Twombly clearly established what an antitrust plaintiff had to plead in order to warrant an inference of prior agreement or conspiracy for purposes of a viable claim under § 1 of the Sherman Act, both the D.C. Circuit in Proctor v. State Farm Mutual Automobile Insurance Co., 675 F.2d 308 (D.C. Cir. 1982), and the Seventh Circuit in Quality Auto Body, Inc. v. Allstate Insurance Co., 660 F.2d 1195 (7th Cir. 1981),[20] held in a summary judgment context that parallel conduct of insurance companies in dealing with automobile repair shops (parallel conduct the same or very similar to that alleged in the instant case) was in the self-interest of each insurance company and thus did not give rise to an inference of prior agreement or concerted action necessary to prove a horizontal price-fixing conspiracy. The D.C. Circuit held:

---

[20]     By coincidence, the Illinois Body Shop in this Seventh Circuit case has a name very similar to that of the New Jersey Quality Auto Shop in the instant case.

29

> There is some evidence of parallel behavior by appellees. Construing this evidence in the light most favorable to appellants, it suggests that upon occasion certain appellees used the same labor rate in writing estimates, that they had similar arrangements with repair shops that agreed to do volume work at the low rates used in their estimates, that they conducted surveys of repair shops to determine the average rate charged by shops in particular areas, and that they tended to resist price increases by repair shops. However, these alleged parallel practices, without more, cannot create an inference or a conspiracy among appellees where, as here, the practices are in the economic self-interest of each of the individual appellees. The practices are as consistent with independent as with concerted actions. Unless an insurance company is willing to pay whatever price is charged at any given repair shop, it stands to reason that it would conduct surveys to determine the rates charged by repair shops. It is equally understandable that a company would, in an effort to control costs, resist price increases and write estimates using the lowest rates acceptable to a sufficient number of quality garages. It also makes economic sense for an insurance company to make arrangements with certain repair shops that agree to do work at the rates used by the company in writing estimates in exchange for volume referrals by the company.

675 F.2d at 1334; see also Workman v. State Farm Mut. Auto. Ins. Co., 520 F.Supp. 610, 621 (N.D. Cal. 1981) (holding, in the same context of insurance companies dealing with automobile repair shops, that parallel conduct very similar to that alleged in the instant case alone does not create an inference of impermissible conspiracy because "[s]uch conduct is in the economic self-interest of each individual insurance company"). All three of these cases so held on the basis of such parallel conduct alone, without the additional nail-in-the-coffin of our plaintiffs' case—i.e., the follow-the-leader practices in our case which conclusively explain why the Insurance Companies here engage in such parallel

30

conduct. As discussed above, it is clearly established that such follow-the-leader practices are legal and do not, by themselves, give rise to an inference of prior agreement. In other words, our case is not only controlled by Twombly but our case is a fortiori from the three cited cases in this same context of an insurance company's dealings with automobile repair shops.

For the foregoing reasons, both of the Body Shops' first two purported plus factors—identity of price and identity of tactics—are mere parallel conduct and do not support their attempt to allege the necessary agreement or conspiracy.

*3. Contrary to Economic Interest*

The Body Shops' brief suggests that the Insurance Companies' adherence to State Farm's artificial "market rate" and other payment structures is in contradiction to the industry databases, and by implication is against their economic self-interest. Courts have recognized a company's actions that were against its self-interest can constitute a plus factor. See, e.g., In re Flat Glass Antitrust Litigation, 385 F.3d 350, 360 (3d. Cir. 2004). Courts and commentators have further observed that this plus factor often restates interdependence in the context of alleged price-fixing. Id. at 361; see also Areeda & Hovenkamp, supra ¶ 1434c1.

This argument exists only by implication because the Body Shops merely entitle the section of their brief "contrary to []economic self-interest." However,

31

they do not explain how the fact that the other Insurance Companies follow the lead of State Farm rather than adhering to the industry databases is against their own self-interest. Nothing in the complaints indicates to us that the actions of the Insurance Companies are against their economic interests. The pages in the complaint cited in the brief do not illuminate the argument either. Moreover, it is hard to imagine how choosing the least costly method of repair, thereby reducing the reimbursement, is contrary to an insurance company's economic self-interest. Thus, we reject this suggested plus factor.

### 4. Opportunity to Exchange Information

The Body Shops also assert in their brief that they alleged that the Insurance Companies "have exchanged or have had the opportunity to exchange information relative to the conspiracy." Appellants' En Banc Br. at 27.[21] However, the argument they make in their brief to support their assertion is: "identical labor rates, identical refusal to compensate for the same processes and procedures, identical false excuses for such refusal, uniform adherence to the refusal to alter labor rates until State Farm does is indicative of shared information and agreement overall and agreement on the language to be used in refusing payment for repair services (a 'script')." Id. In other words, they argue that because the Insurance

---

[21] Although the Body Shops assert in their brief that the Insurance Companies share with each other the identity of problem body shops and other information, the actual complaints make no such allegations.

Companies acted in identical ways, they must have been meeting and exchanging information.

There are two problems with this argument. First, the complaints make no factual allegations that the Insurance Companies either exchanged information, employed identical tactics, followed a script, or declined to pay for the same repairs. Second, even if the actual allegations did indicate considerable uniformity of price and uniformity of tactics, there would be no inference that this was the result of exchange of information for the same reasons discussed above. That is, even if there were considerable uniformity in requiring, for example, repair of parts (not replacement), use of recycled parts (not new), and requiring discounts, such actions just as plausibly result from independent resort to common and rational business practices as from exchange of information. And, as noted above, this is especially true in light of repeated allegations in the complaints that the several Insurance Companies say they will "conform to State Farm's payment structure." Compl. ¶ 115.[22]

---

[22] To the extent that the Body Shops point to their statement in the complaint that "members of the insurance industry meet regularly to discuss such matters in and amongst themselves," Compl. ¶ 115, this statement is so vague as to be useless as support for a conspiracy. The Supreme Court in Twombly advised that plaintiffs' pleading of meetings between defendants needs to provide some degree of detail about the meetings in order to satisfy Rule 8's notice requirements. 550 U.S. at 565 n.10, 127 S. Ct. at 1970 n.10. The Court faulted the plaintiff in Twombly for not providing any details about when, where or with whom in particular the meetings took place. Id.; see also id. at 567 n.12, 127 S. Ct. at 1971 n.12 (suggesting that membership in a trade association is not significant). Referring to Twombly and its footnote 10, Areeda and Hovenkamp opine:"In sum, a conceded 'opportunity' to conspire was completely

*5. Conclusion with respect to Horizontal Price-Fixing Conspiracy*

In sum, the Body Shops have alleged only parallel conduct, and have not alleged any facts supporting plus factors that would tip the scale from equipoise towards conspiracy sufficiently to prevent dismissal of this count. Accordingly, we affirm the district court's dismissal of this claim.

C. Group Boycott

A group boycott is included within the Sherman Act's prohibition of any unreasonable contract, combination, or conspiracy in the restraint of interstate

---

insufficient absent additional allegations about when and where such opportunity occurred, and about which of the defendants' employees participated." Areeda & Hovenkamp, supra, ¶ 1417b. Indeed, the treatise concludes:

> Even if "opportunity" were defined narrowly and limited to proven interfirm contacts, deeming opportunity to be prima facie proof of conspiracy would lead to widespread condemnation of procompetitive collaborations. Once competitors assemble for a lawful activity, they would be presumptive conspirators . . . on every parallel action subsequently occurring. Because parallel pricing is common even in competitive markets, juries would be entitled to infer that competitors had agreed on prices, and price agreements are condemned absolutely. Thus, the effect of holding opportunity sufficient would be to discourage all trade associations, industry gatherings, or joint ventures. Thereby to imperil reasonable and procompetitive collaborations would be inconsistent both with the purposes of the antitrust laws and with well-established Supreme Court permission for many kinds of collaboration among competitors. Mere conspiratorial opportunity is routinely and correctly held insufficient to support a conspiracy finding.

Id. Accord Almanga v. United Airlines, Inc., 851 F.3d 1060, 1071 (11th Cir. 2017) (applying the Twombly standard, and holding "Defendants' participation in trade associations . . . do not show a meeting of the minds"); Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1295 (11th Cir. 2010) ("[I]t was well-settled before Twombly that participation in trade organizations provides no indication of conspiracy").

trade or commerce. 15 U.S.C. §§ 1, 1013(b); St. Paul Fire & Marine Ins. v. Barry, 438 U.S. 531, 541, 98 S. Ct. 2923, 2929 (1978). A boycott consists of "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." Barry, 438 U.S. at 541, 98 S. Ct. at 2930. The "ultimate target" of the agreement can be either a competitor or "a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]." Id. at 543, 98 S. Ct. at 2931. For boycotting to be per se illegal, it must involve "horizontal agreements among direct competitors." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 119 S. Ct. 493, 498 (1998). In other words, as with the price-fixing claim of the Body Shops, their conspiracy to boycott claim requires as a prerequisite sufficient allegations of an agreement or conspiracy. Again the crucial, antecedent question is whether the alleged actions of the Insurance Companies stem from independent actions or from prior agreement.

The boycott allegations in this case are even weaker than the allegations of price-fixing. Neither the "steering" allegations nor the "boycott" section of the complaint allege even in conclusory fashion that there was an agreement to do so. And even if we incorporate the conclusory allegations of an agreement from the price-fixing sections of the complaint, the instant complaint would still fall short of

35

even the "few stray statements [that] speak directly of agreement" which the Supreme Court has held are insufficient. Twombly, 550 U.S. at 564, 127 S. Ct. at 1970.

The Body Shops have asserted in their appellate briefing facts that are simply unsupportable on this record. Indeed, although the Body Shops have argued on appeal that "[a]ll of the Defendants utilize the same script containing identical false and misleading steering statements," both the word "script" and the word "identical" are conspicuously absent from the complaints. Quite the contrary, in the only factual allegations with regard to steering insureds away from their shops, the Body Shops allege that:

> Examples of this practice include telling insureds and/or claimants that a particular chosen shop is not on the preferred provider list, that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

Compl. ¶ 83. From this, it is argued in the Body Shops' brief that the Insurance Companies have engaged in "identical" tactics.

There is nothing in these allegations that would suggest action in concert or "rule out the possibility that the defendants were acting independently." Twombly, 550 U.S. at 553-54, 127 S. Ct. at 1964. There is no allegation that all or most of

36

the Insurance Companies used most or all of the foregoing excuses in urging insureds against patronizing a shop. There is no allegation that the several companies used the same language. There is no allegation suggesting any other uniformity that would be unexpected or idiosyncratic.

Moreover, even if there were considerable uniformity with respect to those reasons that an insured should not use a particular shop, there could hardly be reasons more expected or more commonly used than those alleged by the Body Shops. That the shop is not on the preferred provider list, that there are quality issues, that it charges more, and/or that it takes longer are reasons that any company would be expected to use in an effort to persuade an insured not to use a particular shop. The alleged boycotting methods are not so idiosyncratic that they suggest conspiracy. To the contrary, they are methods that would logically be employed by any insurer to dissuade its insureds from using a disfavored shop. In other words, even a considerable uniformity with respect to the use of these reasons would fall well within the "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Id. at 554, 127 S. Ct. at 1964.

For the same reasons that it forecloses the Body Shops' price-fixing claim, Twombly forecloses the Body Shops' group boycott claims; their allegations allege only parallel conduct which is insufficient to create an inference of prior agreement

or conspiracy.  The Seventh Circuit in Quality Auto, 660 F.2d at 1206, and the Northern District of California in Workman, 520 F. Supp. at 623, rejected similar group boycott claims in this same context involving parallel conduct on the part of several insurance companies in their dealings with automobile repair shops.

For the foregoing reasons, we affirm the district court's dismissal of the Body Shops' group boycott claims.

## V. THE STATE LAW CLAIMS

The Body Shops bring three state law claims for unjust enrichment, quantum meruit, and tortious interference.  We address each in turn.

### A.  Unjust Enrichment Claims

The Plaintiffs in all four states bring claims of unjust enrichment against these Defendants.  Under the laws of the four states relevant here—Kentucky, Missouri, New Jersey, and Virginia—the elements of the cause of action include: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware thereof; and (3) it would be unjust to permit the defendant to retain the benefit.[23]

---

[23]    See Jones v. Sparks, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) ("For a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value."); Binkley v. Am. Equity Mortg., Inc., 447 S.W.3d 194, 199 (Mo. 2014) ("An unjust enrichment claim requires a showing that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances") (quotation omitted); VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994) ("To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust."); Schmidt v.

38

The gist of the Plaintiffs' claims is that the several Body Shops conferred a benefit on the several Insurance Companies, the latter were aware thereof, and allowing the Defendants to retain the benefit without full payment would be unjust.

Fatal to these unjust enrichment claims is the fact that each of the five complaints alleges that each Insurance Company advised the Body Shops that it would pay no more than State Farm. Because the Plaintiff in each complaint knew before it undertook the repair that each Defendant-Insurance Company would pay no more than State Farm would pay, it clearly was not unjust for the Insurance Company to pay only that amount and no more. Without satisfying the unjust element, the cause of action fails even if we assume the other elements can be satisfied.

The Body Shops' only response to this fatal flaw is that they could not turn away sixty to ninety-five percent of the available repair business,[24] and therefore their contract to accept the amount State Farm would pay was an invalid contract.

---

Household Fin. Corp., II, 661 S.E.2d 834, 838 (Va. 2008) ("To state a cause of action for unjust enrichment, [a plaintiff has] to allege that: (1) he conferred a benefit on [the defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value."). Although the Virginia rule statement does not expressly require that retention of the benefit be unjust, such a requirement is routinely read into the elements by Virginia courts. See, e.g., R.M. Harrison Mech. Corp. v. Decker Indus., Inc., 75 Va. Cir. 404, 2008 WL 10669311, at *3 (2008) ("The circumstances of the acceptance or retention of the benefit must render it inequitable for the defendant not to compensate the plaintiff.").

[24]     Aside from this allegation relating to market power, the Body Shops have alleged no concrete facts that might give rise to an inference of force.

However, the Body Shops cite no law—in any of the four states—to the effect that market power alone is sufficient to invalidate a contract voluntarily entered into. Our independent research has also uncovered no such case. Moreover, we have already concluded that the Body Shops have failed to allege facts warranting an inference that the Insurance Companies agreed to or engaged in a conspiracy. Thus, the Body Shops' premise of market power may also collapse in any event.

We conclude that the Body Shops' unjust enrichment claims are wholly without merit.

B.  Quantum Meruit Claims

The Body Shops in four of the five complaints[25] before us also bring quantum meruit claims arising under the laws of Kentucky, New Jersey, and Virginia. To state a cause action for quantum meruit, the Body Shops were required to allege, among other elements, that the circumstances <u>reasonably</u> notified the Insurance Companies that the Body Shops expected to get paid (Virginia and Kentucky) or that they <u>reasonably</u> expected to be compensated (New Jersey).[26] They cannot do so here.

As discussed above, the Body Shops specifically alleged that each of the Insurance Companies informed them that they would pay no more than State Farm.

---

[25]    The Missouri complaint does not include a cause of action for quantum meruit.

[26]    <u>See</u> <u>Raymond, Colesar, Glaspy & Huss, P. C. v. Allied Capital Corp.</u>, 961 F.2d 489, 491 (4th Cir. 1992) (applying Virginia law); <u>JP White, LLC v. Poe Cos., LLC</u>, 2011 WL 1706751, at *5 (Ky. Ct. App. May 6, 2011); <u>Weichert Co. Realtors v. Ryan</u>, 608 A.2d 280, 285 (N.J. 1992).

The Body Shops then undertook the repairs. Having fully informed the Body Shops of what they were willing to pay, the circumstances could have only reasonably informed the Insurance Companies that the Body Shops expected to be paid the amount State Farm would pay. This is fatal to the Virginia and Kentucky claims. Likewise, having been fully informed that the Insurance Companies would only pay the amount State Farm would pay, the Body Shops could not have reasonably expected to receive more than that amount. This is fatal to the New Jersey claim.

The Body Shops have cited no authority—and our independent research has uncovered none—to support their position that they can contract to repair the car for a specified amount, do the repair, and then sue, claiming that they should be paid more. The only analogous case law our research has uncovered suggests just the opposite of the Body Shops' position: when a plaintiff has a reasonable expectation of some amount, they cannot reasonably expect to receive additional compensation and therefore cannot bring suit to recover it.[27]

We conclude that the quantum meruit claims of the Body Shops in the four complaints are wholly without merit.

---

[27] See, e.g., Hindsight Sols., LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 776 (S.D.N.Y. 2014) (unjust enrichment claim failed because plaintiff could not have reasonably expected to receive additional compensation); Rodriguez v. Ready Pac Produce, 2014 WL 1875261, at *3 (D.N.J. May 9, 2014) (dismissing unjust enrichment claim where plaintiff "would have no reasonable expectation to receive additional compensation for hours worked in excess of a particular amount per week").

## C. Tortious Inference Claims

Although we have concluded—as did the district court—that the unjust enrichment and quantum meruit claims of the Body Shops are wholly without merit, the situation with respect to their tortious interference claims is more complicated. The district court expressly adopted and approved the magistrate judge's dismissal of the tortious interference claims as a violation of the group pleading doctrine. The district court held:

> Consistent with this Court's prior orders, a general allegation that some unidentified Defendants—or all Defendants—interfered with some unidentified customers of some unnamed plaintiff does not satisfy the pleading standard of Ashcroft v. Iqbal, 556 U.S. 662 (2009). Because the Plaintiffs' allegations are too vague to satisfy Rule 8(a), Judge Smith recommends dismissal of all the tortious interference claims. (June 3 Report at 39).

Doc. 222 at 7. Although the district court invoked Iqbal, we understand its ruling to be based on a very narrow group pleading rationale, rather than a standard-issue Twombly-Iqbal determination of the plausibility of the tortious interference claims in light of the well-pleaded factual allegations.[28] The gist of the problem with group pleading—as the magistrate judge noted earlier on page 9 of that same June

---

[28] We note that, in a report and recommendation adopted by the district judge in dismissing another complaint in this multidistrict litigation, the magistrate judge concluded that the allegations adequately alleged the elements of Tennessee tortious interference and did state a plausible claim if taken as true, but determined that the complaint "suffer[ed] from a different problem"—i.e., the group pleading issue. *Brewer Body Shop v. State Farm Mut. Ins. Co.*, 101 F. Supp. 3d 1256, 1265–66 (M.D. Fla. 2015). We take and mean to imply no position on the correctness of that plausibility holding. We mention it only to observe that the magistrate judge seems to have considered the group pleading "problem" as a separate matter from a run-of-the-mill Twombly-Iqbal analysis.

3 report—is the failure to give fair notice to each named defendant of the claims against it. For example, a complaint may fail to provide fair notice of the claims by failing to specify which defendants interfered with which plaintiffs. Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1323 (11th Cir. 2015). Because the district court rested its dismissal of the tortious interference claims on this narrow group pleading rationale, and because we think the district court will be well situated to determine the status of these claims on remand, we need not address the merits of the tortious interference claims or even the general contours of the doctrine of group pleading. We also do not address the relationship between that doctrine and the Twombly-Iqbal plausibility pleading standard or, for that matter, whether the allegations of tortious interference meet the plausibility standard. We address only the above-quoted narrow basis on which the district court relied.

We cannot agree with the district court that the instant five complaints' failure to name a plaintiff, to identify specific defendants, or to identify specific customers in the allegations relating to tortious interference deprived the Defendants of fair notice. Contrary to the suggestion of the district court, there is no problem with respect to "some unnamed plaintiff." In four of these five cases, there is only one plaintiff and thus it is absolutely clear that the person or entity interfered with is the single named plaintiff in each complaint. Although the fifth

43

case[29] involves four named plaintiffs, they are four body shops located in close proximity to each other in Virginia Beach and Suffolk, Virginia. It is amply clear in this fifth complaint that each Defendant-Insurance Company is alleged to have tortiously interfered with each of these four Virginia body shops. The allegations provide fair notice that each of the Plaintiffs is claiming that each of the named Defendants is tortiously interfering in the manner alleged with the named Plaintiff in each of the four single-plaintiff complaints and with the four named Plaintiffs in the fifth case.[30]

We are also unpersuaded by the district court's concern that the allegations in the complaints concern "some unidentified Defendants—or all Defendants." The substance of the alleged tortious interference is as follows. As alleged in ¶¶ 107-08 of the representative Quality Auto complaint, each complaint alleges that the named Insurance Companies—by means of a campaign of misrepresentation of facts about poor quality, etc.—have repeatedly steered their insureds away from each named Plaintiff to punish that Plaintiff for complaints about or refusal to submit to the price ceilings and other practices imposed by the named Defendants. Although these allegations are aimed generally at "the Defendants," each

---

[29]    The fifth case, Pappas Body Shop, Inc., v. State Farm Mutual Automobile Insurance Co., No. 15-14179, has four listed plaintiffs.

[30]    Counting the named Insurance Companies in the same corporate family as a single defendant, as the district court did earlier in its opinion, Doc. 222 at 4, there are between twelve and twenty named defendants in the five complaints.

44

complaint stipulates that, "[w]here the term 'Defendants' is used within this Complaint, 'Defendants' is intended to and does mean each and every Defendant named in the caption above." In other words, the named Defendants[31] in each complaint had fair notice that "each and every" one of them is alleged to have improperly steered its own insureds away from the named Body Shops in each complaint because that Body Shop was not compliant with that Insurance Company's preferred reimbursement rate and other cost-saving practices.

Thus, of the potential deficits identified by the district court—i.e., general allegations about "unidentified Defendants," "unidentified customers," and "unnamed plaintiff[s]"—the only possible defect remaining is the failure to identify specific insureds/potential customers who were thus steered. We cannot conclude that the Body Shops' failure to identify particular potential customers who were steered away constitutes a failure to give each defendant fair notice of the claim against it. It is not the potential customer who is the target of the alleged tortious interference; it is the targeted Body Shop. A potential customer may—but very well may not—tell the Body Shop that he or she was steered away. On the other hand, each Insurance Company, or its claims adjusters, will know whether the company engages in such a practice, and will know whether each named Plaintiff in the five complaints was noncompliant with that company's preferred

---

[31]    The named Insurance Companies in each of the five complaints are not identical.

45

practices and, most important, whether its insureds were steered away from that Plaintiff Body Shop.

In sum, we are not persuaded by the district court's grounds for concluding that the allegations of tortious interference in each of these five cases violated the group pleading doctrine, i.e., failed to give fair notice to each defendant of the claim being made against it. Accordingly, we vacate the judgment of the district court only with respect to the tortious interference claims in each of these five cases, and we remand for further proceedings. We note that in vacating the judgment of the district court with respect to the tortious interference claim, we have ruled only on the district court's stated group pleading rationale. We note also, because the federal antitrust claims have been eliminated from the case, the district court may well decide to exercise its discretion to decline to exercise pendent jurisdiction of these state law tortious interference claims, pursuant to 28 U.S.C. § 1367.[32]

## VI. CONCLUSION

---

[32] We note that declining to exercise pendent jurisdiction is only one of the various options available to the district court on remand. We emphasize that we vacate the judgment of the district court with respect to the tortious interference claims only on the above described basis— i.e., our rejection of the narrow theory of group pleading upon which the district court relied. We decline to address other possible theories on the basis of which that judgment might have been affirmed (whether on the basis of the merits or other pleading deficiencies, including even other possible group pleading theories).

We affirm the judgment of the district court dismissing all of the claims except the tortious interference claims, which we vacate and remand for further proceedings not inconsistent with this opinion.

AFFIRMED in PART, VACATED in PART, and REMANDED.

JORDAN, Circuit Judge, joined by MARTIN, Circuit Judge, concurring:

I concur in Parts II, III, and V of the court's opinion. And given the pleading standards that the Supreme Court has put in place for antitrust cases, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553–70 (2007), and the complaint's failure to include important factual allegations on which the plaintiffs now rely, I concur in the judgment as to Parts I and IV.

I have some concerns about a court relying on its own independent research with respect to facts on the ground, particularly in a motion to dismiss context. I am not convinced that we should be citing to a book on collision repairs, *see* Maj. Op. at 5, to understand how the auto repair industry actually operates. This is not the sort of adjudicative fact—a fact which is "relevant to a determination of the claims presented in a case," *Dippin' Dots, Inc. v. Frosty Bites Dist.*, 369 F.3d 1197, 1204 (11th Cir. 2004)—which can be judicially noticed under Rule 201 of the Federal Rules of Evidence.

The taking of judicial notice is "a highly limited process" because it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (en banc). In my view, how the auto repair industry works is not a matter that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 201(b)(2). *Cf. A & H*

*Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 191, 196 (3d Cir. 1999)

(denying motion to take judicial notice that swimwear and lingerie are separate

industries because "it requires a factual determination [which is] inappropriate for

judicial notice").

WILSON, Circuit Judge, dissenting in part:

Anticompetitive exercises of buyer market power often go unpunished.[1] Not because the antitrust laws and existing antitrust jurisprudence cannot address them, but because it is often counterintuitive. To the average non-efficiency minded observer, condemning a practice that results in low prices seems like bad policy. But low prices do not tell the whole story. Antitrust law—with its goal to enable optimal market output through competition—demands a closer look. It is in that context that this case asks us to determine when an antitrust complaint alleging an anticompetitive exercise of collective buyer market power can survive a motion to dismiss.

At this early stage, the law requires us to view the complaint as a whole, accept all the allegations as true,[2] draw all reasonable inferences in favor of the body shops, and only then decide whether the allegations, taken together, plausibly suggest an agreement. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

---

[1] *See generally* Herbert Hovenkamp, *Whatever* Did *Happen to the Antitrust Movement?*, 94 Notre Dame L. Rev. 583, 628–36 (2018).

[2] Relatedly, *Twombly* instructs us to resist reasoning backwards from our own version of the facts or knowledge of the industry at issue. *See* Maj. Op. at 5 (citing Alfred M. Thomas & Michael Jund, *Collision Repair and Refinishing: A Foundation Course for Technicians* 7 (2014)); Maj. Op. at 22 ("[T]he 'products' here—cars—are so readily assembled from standard parts that their assembly line manufacturing set the standard for other industries."); Maj. Op. at 27 (noting that for the auto insurance industry, "parts and labor reimbursements are the primary business expenditures"). Imagine the already difficult job of a district court analyzing an antitrust complaint if that was *Twombly*'s directive: not just to analyze the facts alleged in the complaint in front of it, but to embark on its own independent fact-finding mission to determine whether other facts might exist that discredit those we must accept as true.

Following that directive, and viewed in the proper economic context, the body shops' allegations state a price-fixing claim under the Sherman Act.[3]

The majority portrays this as an easy case for condemning an antitrust action under *Twombly*, finding a lack of so-called "plus factors" required to allege a plausible agreement under Sherman Act § 1. And if the law and facts were as simple as described by the majority, I would be inclined to agree. But the majority's narrow view of *Twombly* does not represent the balance the Supreme Court struck between the cost of antitrust discovery and the burden on antitrust plaintiffs—the "group of private attorneys general," *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977)—tasked with enforcing the antitrust laws.

I.     The Basic Economics of Buyer Cartels

The body shops plausibly allege an agreement when viewed in the context of *buyer*, rather than seller, cartels. The difference has confused many courts. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 350b (4th ed. 2017) ("Clearly mistaken is the occasional court that thinks low buying prices procompetitive regardless of the restraints on competition that lead to such prices . . . . The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels—namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of

---

[3] The majority correctly concludes that the group boycott allegations are too conclusory to state a claim. I dissent only on the price-fixing claim. *See* Maj. Op. at Part IV (B).

51

prices."); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103–04 (3d Cir. 2010) (reversing district court and rejecting its reliance on the argument that "low reimbursement rates translate into low premiums for subscribers" because "[s]uch shortchanging poses competitive threats similar to those posed by conspiracies among buyers to fix prices").

Buyer cartels cause "suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run." *W. Penn*, 627 F.3d at 104. An oligopsony market is one in which a cartel of relatively few buyers has significant market power in the buying market. Compared to a competitive market, oligopsony generates infracompetitive[4] input prices and a smaller quantity of the input demanded. *See generally* Areeda & Hovenkamp, *supra*, ¶¶ 2002, 2011. Using body shop labor as an example, a simplified causal chain goes like this: A group of auto insurers form a cartel and collectively agree on the maximum price they will pay for body shop labor. The cartel collectively dominates the market for the *purchase* of body shop labor. The cartel also collectively dominates the market for the *sale* of auto insurance. There are no substitute "inputs" for auto body shop labor—the ability to sell auto insurance depends on the ability of each insurer to purchase auto body labor. The colluding insurers pay a lower price for body shop labor, which, given the simple

---

[4] Infracompetitive means below the competitive level—that is, a price below marginal cost.

52

mechanics of supply (production) and demand (price), drives down the quantity of auto body shop labor produced. In other words, in response to the artificially low market price of labor, auto body shops produce fewer units (hours) of body shop labor. The first anticompetitive effect, then, is below-market body shop labor output.

With fewer units of body shop labor now on the market, insurers have fewer units available to purchase. Because the insurers purchase fewer units of body shop labor, they have fewer units to incorporate into their final "product"—auto insurance. Assuming the colluding insurers have collective market power in the selling market—the market for auto insurance—the necessary result is that insurers must either: (1) decrease the number of "units" of labor included in each insurance policy (say by decreasing the quality or number of repairs so that each repair requires fewer labor hours); or (2) include the same number of units of labor in insurance policies and sell fewer insurance policies, which would require a price increase. The second anticompetitive effect, then, is on *consumers of auto insurance*: lower quality auto insurance (insurance that covers lower quality or fewer repairs) and increased prices for the same quality insurance.

The upshot is that the colluding auto insurers can increase profits by purchasing their inputs (body shop labor and repair parts) at a price below the

competitive level and selling their output product (auto insurance) at a price above the competitive level.[5]

With this framework in mind, it is easy to see why insurers have a motive to form an agreement. Every colluding insurer is better off, at least in the short run, if they all comply with the agreement: the insurers can only continue to purchase inputs at infracompetitive levels if the other insurers do not cheat on the agreement and purchase more units, driving up the market rate. But every insurer also has an incentive to cheat. If one insurer purchases more hours of body shop labor, it can sell either higher quality insurance (insurance that covers more or higher quality repairs) or it can sell more units of insurance. "The individual cartel member experiences the full benefit of [purchasing more inputs] but only a portion of the burden of the [increase] in the market price, which is shared by all cartel

---

[5] Because the auto body shops allege a per se illegal agreement among the auto body insurers to fix prices, they are not required adequately to allege anticompetitive harm. Even so, the anticompetitive effects of monopsony power are well-documented, both in the context of horizontal cartel agreements and horizontal mergers. *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.) (holding employees' allegations of information exchanges and oligopsonistic market sufficient to state claim of wage suppression conspiracy); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998) (condemning agreement among colleges to limit salaries of basketball coaches); *United States v. Anthem, Inc.*, 855 F.3d 345, 378 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) (disagreeing on the availability of efficiency defense to merger of two health insurers but recognizing that if the merged insurer "would obtain provider rates that are below competitive levels because of its exercise of unlawful monopsony power against providers, that could be a problem, and perhaps a fatal one for this merger"); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) (sustaining complaint that hospital system and health insurer conspired to suppress reimbursement rates paid to healthcare providers).

members . . . . [I]f everyone cheats without limit, the market moves back to the competitive price." Areeda & Hovenkamp, *supra*, ¶ 2002d.

## II.     The *Twombly* Standard

We review motions to dismiss de novo. *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1332 (11th Cir. 2010). To state a claim under Sherman Act § 1, a complaint must contain "allegations plausibly suggesting (not merely consistent with) agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).[6] "Plausibility is the key," and the well-pleaded allegations "must nudge the claim across the line from conceivable to plausible." *Jacobs*, 626 F.3d at 1333 (internal quotation marks and citations omitted). "But no part of the *Twombly-Iqbal* pleading standard requires a plaintiff to provide *evidence* for the factual allegations in a complaint before they are entitled to the assumption of truth at the motion-to-dismiss stage." *Hi-Tech Pharm., Inc. v. HBS Int'l, Corp.*, 910 F.3d 1186, 1197 (11th Cir. 2018) (internal quotation marks omitted). "And, of course, a

---

[6] Given the majority's extensive reliance on *Twombly*'s antitrust holding, it is worth noting how the antitrust allegations here are unlike those in *Twombly*. The complaint in *Twombly* alleged that four dominant telephone companies agreed not to compete by dividing the market into exclusive selling territories. *Twombly*, 550 U.S. at 551. The totality of the allegations to support an agreement were that: the four phone companies did not expand into one another's territories, each defendant excluded other companies from their respective territories, and the CEO of one of the telephone companies had once stated that expanding to its rivals' territories "might be a good way to turn a quick dollar but that doesn't make it right." *Id.* at 550. "[P]rice fixing is a very different practice, producing different kinds of signals, from the market division scheme alleged in *Twombly*. Most importantly, parallel lockstep pricing requires interdependence, while simultaneous failure to enter one another's markets creates no such inference . . . . By contrast, the *Twombly* complaint, which alleged little more than a parallel failure to enter one another's markets, did no more than describe behavior that was equally consistent with collusion and competition." Areeda & Hovenkamp, *supra*, ¶ 1434c2.

well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

### III. Allegations Plausibly Suggesting an Agreement

Because price fixers typically conceal their conspiracies, courts may infer an agreement from circumstantial evidence. *See id.* at 553. To survive a motion to dismiss, the plaintiff must allege "parallel conduct" plus "further factual enhancement." *Id.* at 557. These so-called "plus factors" serve as proxies for direct evidence of an agreement. We have never prescribed a rigid set of factors or the weight of any particular factor. Instead, "*any* showing that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil Co. v. Phillip Morris U.S.A.*, 346 F.3d 1287, 1301 (11th Cir. 2003) (emphasis added) (internal quotation marks omitted). The importance of any factor rests on its tendency to show that the defendants' behavior is plausibly consistent with a price-fixing conspiracy, as opposed to a rational and competitive business strategy, independently adopted by competing firms. *See id.*

### A. Consciously Parallel Conduct

The complaints are replete with factual allegations showing consciously parallel conduct, including perhaps the quintessential example of it: all the defendants routinely and uniformly refused to pay more than State Farm. The

insurers also uniformly: used the same formula for reimbursing paint jobs, refused to reimburse body shops for a specific set of repairs, and refused to reimburse shops for new or higher quality parts.[7]

B. Plus Factors

"An allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted). With the allegations already "close to stating a claim," *id.*, we must decide whether the body shops allege plus factors sufficient to nudge their allegations of conspiracy into a plausible entitlement to

---

[7] In discussing uniformity of tactics, the majority notes: "Not only is there no allegation of identical or similar language, the language actually used in the complaints suggests just the opposite. As noted, ¶ 63 alleges '[t]hrough various means' and ¶ 64 alleges '[s]ome of these methods'—i.e. phrases that do not suggest that all or a substantial group of the Insurance Companies engage in all or most of the methods in strikingly similar ways." Maj. Op. at 26. That portion of the complaint says: "Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiff into accepting less than actual and/or market costs for materials and supplies," and then the next paragraph lists "[s]ome of these methods." Compl. ¶¶ 63, 64. These two sections could reasonably be read to mean the Defendants have all instituted *various methods of coercing* the body shops—rather than the majority's reading that each of the Defendants instituted varying methods. While far from an object of clarity, if we view this section as a whole, the majority's reading is implausible. This paragraph begins the section titled "Suppression of Repair and Material Costs." The rest of the section describes the "various methods," and clarifies that "the Defendants" engage in those methods. *See, e.g.*, Compl. ¶ 65 ("In addition to the above, the Defendants have repeatedly and intentionally failed to abide by industry standards for auto repairs."); Compl. ¶ 67 (noting that "the Defendants will refuse to allow the body shop to perform required procedures and processes"); Compl. ¶ 68 ("A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit '3.'"). "As we have explained, a court reviewing a motion to dismiss must draw all reasonable inferences from the factual allegations in a plaintiff's complaint in the plaintiff's favor." *Bailey v. Wheeler*, 843 F.3d 473, 482 (11th Cir. 2016).

relief. The majority thinks they did not. But viewed as a whole, the body shops have done enough to proceed to discovery.

### 1. Plus Factor: Customary Indications of Traditional Conspiracy

A widely accepted plus factor is allegations showing customary indications of a traditional conspiracy. *See* Areeda & Hovenkamp, *supra*, ¶ 1434b. Conduct that "does not result from chance, coincidence, independent responses to common stimuli, or mere interdependence" falls into this category. *Id.* at ¶ 1425. This conduct includes allegations suggesting the defendants adopted uniform prices and practices despite variables that would ordinarily, absent an agreement, cause those prices and practices to diverge. *See id.* In other words, conduct that conflicts with "what that defendant's legitimate economic self-interest would be under the assumption that it acted alone." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 570 n.33 (11th Cir. 1998).

### i. *Uniform Pricing Behavior*

"[T]he fact that competitors have knowingly charged identical prices is a neutral fact *in the absence of* evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made." *Id.* at 571 (emphasis added) (internal quotation marks omitted) (reversing the district court's grant of summary judgment for defendants on price-fixing claim).

58

There are allegations in the complaints at issue plausibly suggesting prices would be different absent an agreement.[8]

First, all the insurers charge the same rate as State Farm without independent market information or verification of State Farm's calculation of labor rates. Second, the insurers all use State Farm's geographic market definitions for determining the labor rate, without determining whether the insurer may different relationships with the shops surveyed in that area. Third, *State Farm's rate is not in fact the market rate*: State Farm arbitrarily calculates and unilaterally modifies it to reach an infracompetitive figure. The body shops allege that each insurer uniformly conformed to this identical arbitrary and infracompetitive market rate without conducting their own surveys of the body shops they use or drawing their own market boundaries using the location of their insureds or their DRP shops.

---

[8] The majority finds it significant that this case does not contain the precise market factors that made convergent pricing suspect in prior cases—the "secret," "sealed," and "simultaneous" bids that suggested the identical prices in *FTC v. Cement Inst.*, 333 U.S. 683, 713 (1948), were the product of collusion. *See* Maj. Op. at 18–23. While the Supreme Court used these factors to show the dubious provenance of the prices in *Cement Institute*, they certainly are not the only way—or, in the seventy years since the Supreme Court's decision in that case, the typical way—to do so. *But see* Maj. Op. at 19 ("[T]he Body Shops quote a leading antitrust treatise for the idea that an agreement may be present if rivals establish identical prices, but they fail to grapple with the caveat that this is *only true* where there are 'simultaneous identical bids on a made-to-order product not readily assembled from standard and conventionally priced items.'" (emphasis added) (quoting Areeda & Hovenkamp, *supra*, ¶ 1434b)). Just after the portion quoted by the majority, the same treatise gives a host of other examples that may amount to "parallelism that is too close for coincidence and beyond explanation by mere recognized interdependence" including "conspiratorial opportunity, unexplained meetings, furtive behavior, discussions and information exchanges, ambiguous participant admissions, solicitations of agreement, sham bids, threats of common action directed against a potential victim, identical bids, refusals to bid, proved conspiracy or competition in other markets or times." Areeda & Hovenkamp, *supra*, ¶ 1434b. The allegations here make other cases better analogues. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010).

Each insurer, then, is not merely responding to "common stimuli" in the market. *See Twombly*, 550 U.S. at 556 n.4 (quoting Areeda & Hovenkamp, *supra*, ¶ 1425).

Why would an insurer blindly accept a rate determined arbitrarily by one of its competitors and divorced from the true competitive rate? Collusion—and with it the assurance that other competitors will do the same—might not be the only possible answer, but it is a plausible one. *See, e.g.*, *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333–35 (3d Cir. 2018) (finding plus factor where insurers adopted a model policy's approach to reimbursement of certain medical device with "near total uniformity" and reasoning that it was improbable "that the same coverage decision would be reached by nearly all the [insurers] independently" because some other insurers, independent medical review boards, and some medical studies concluded the device was medically necessary or met the standard of care); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (finding a plus factor where all defendants adopted a "uniform pricing structure" that raised prices in the face of falling costs, suggesting it was the "sort of restricted freedom of action and sense of obligation that one generally associates with agreement" (internal quotation marks omitted)); *cf. Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 334 (D.C. Cir. 1982) (noting that "[u]nless an insurance company is willing to pay whatever price is charged at any given repair shop, it stands to reason that it would conduct surveys to determine the rates

charged by repair shops," after discussing evidence that the defendant insurers conducted their *own independent surveys* of body shop rates, which *sometimes* led to the same rate).

Another element of the insurers' pricing behavior makes it competitively suspect. While the majority correctly states that requiring discounts is "among the most common and time-worn methods of increasing corporate profits," Maj. Op. at 27, uniformly adhering to a rate that drives the input price *below cost* is neither common nor consistent with rational independent business activity.

The uniform "market rate" is below cost—including "artificially created less-than-market labor rates" and "less than actual and/or market costs for materials and supplies."[9] The insurers have uniformly and persistently kept the labor rate at this infracompetitive level, even in the face of rising input costs and an awareness that the price was below the body shops' costs. The body shops allege that "multiple body shops have attempted to raise their labor rates and advised State Farm of such." Compl. ¶59. But State Farm tells each body shop, falsely, that "they are the only one to demand a higher labor rate." Compl. ¶ 59.

---

[9] *See* Compl. ¶ 61 ("net effect of this tactic is to allow State Farm to manipulate the 'market rate' and artificially suppress the labor rate"; Compl. ¶ 62 ("These Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiff into accepting the artificially created less-than-market labor rates"; Compl. ¶ 63 ("Defendants have, independently and in concert, instituted numerous methods of coercing the plaintiff into accepting less than actual and/or market costs for materials and supplies"); Compl. ¶ 64 ("requiring discounts and/or concessions, even when doing so requires the shop to operate at a loss"); Compl. ¶ 71 (Defendants universally used formula for reimbursing paint repairs "which compensates the shops for only half the actual cost on average").

In a buyers' cartel, uniform infracompetitive input prices in the face of rising input costs plausibly suggests an agreement among buyers. *Cf. City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572–73 (11th Cir. 1998) (holding in the context of a sellers' cartel that parallel increased prices despite falling costs, high incumbency rates, and awareness of other sellers' prices plausibly suggest conspiracy not to compete on price); Areeda & Hovenkamp, *supra*, ¶ 1434d3 (citing *City of Tuscaloosa* favorably for this plus factor); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360–61 (3d Cir. 2004) (finding, in the context of a sellers cartel, "[e]vidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market. In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs."); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (finding a plus factor where defendants raised price above competitive market price despite falling costs, and uniformly included contract term that industry commentator said was unprofitable, reasoning that "some form of agreement among defendants would have been needed to render the enterprises profitable"); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.) (finding a plus factor where allegations included that "in the face of steeply falling costs, the defendants increased their prices . . . because falling

costs increase a seller's profit margin at the existing price, motivating him, in the absence of agreement, to reduce his price slightly in order to take business from his competitors, and certainly not to increase his price").

The economic basis for this conclusion is well established. Recall the incentives created in a cartel. Every insurer is better off if they all comply with the agreement: the insurers can only continue to purchase inputs at infracompetitive levels if the other insurers do not cheat on the agreement by purchasing more hours of body shop labor and driving up the market rate. But every insurer also has an incentive to cheat. If one insurer purchases more hours of body shop labor, it can steal business from its rivals by selling either higher quality insurance (insurance that covers more or higher quality repairs) or more units of insurance. "The individual cartel member experiences the full benefit of [purchasing more inputs] but only a portion of the burden of the [increase] in the market price, which is shared by all cartel members . . . . [I]f everyone cheats without limit, the market moves back to the competitive price." Areeda & Hovenkamp, *supra*, ¶ 2002d; *see also id*. at ¶ 1434c2 (noting that *In re Text Messaging* relied on "sound economic theory about collusion and the behaviors that are very difficult to explain in its absence"). Sustained infracompetitive input prices requires agreement among purchasers, and, as a result, allegations of infracompetitive input rates in an

oligopsonistic purchasing market at least constitute a plus factor that, along with the other allegations plausibly suggests collusion.[10]

    *ii.    Uniform Refusal to Follow Industry Standards and Uniform Quality*

First, the insurers uniformly require repair shops to use used or imitation parts, even where new or OEM parts are necessary to put the vehicle in pre-accident condition. Second, the insurers refuse to reimburse for repairs that, in the "shop's professional opinion" are required for a safe and quality repair. Third, the insurers unvaryingly refuse to reimburse the body shops for the same list of repairs and services, even where a listed repair or service is necessary to return a given

---

[10] To argue that the identical prices here are not cause for concern, the majority cites the Seventh Circuit's decision in *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir. 1981). *Quality Auto Body* was an appeal from the grant of summary judgment for the insurers. The plaintiff body shop conducted significant discovery, including each insurer's rates, depositions of their executives, and the results of State Farm's surveys. *See Quality Auto Body*, 660 F.2d at 1200 ("The uncontroverted affidavits and deposition testimony submitted by defendants establish that each company has unilaterally developed its own claim-handling procedures."). The Seventh Circuit found that, contrary to the plaintiff's complaint, the evidence after discovery revealed that the labor rates used by the insurers were variable and that each insurer "uses a different method for determining the lowest prevailing competitive rate." *Id.* The complaint that apparently warranted discovery merely alleged that the insurers followed a "common formula" for calculating rates. *Id.* Similarly, in the other case the majority cites for this proposition, *Proctor v. State Farm Mutual Automobile Insurance Co.*, 675 F.2d 308, 316 (D.C. Cir. 1982), the D.C. Circuit similarly reviewed an order granting summary judgment. Noting this important distinction, the court reasoned that "[i]n considering whether to grant summary judgment in this case the District Court relied . . . on the length of time . . . and the ample opportunities for discovery that the appellants had to 'unearth evidence to support their allegations." *Proctor*, 675 F.2d at 316 (internal quotation marks and citations omitted). The results of discovery—all the body shops here seek—from a pair of cases in the 1980s can hardly undercut the allegations we must accept as true at the motion to dismiss stage. And if the body shops here are similarly unsuccessful at uncovering evidence of a conspiracy during discovery, they too would lose at summary judgment.

vehicle to pre-accident condition.[11]  Fourth, the insurers refuse to comply with

industry standards, including three separate independent auto collision repair

databases.  The databases include the "ordinary and customary repairs, repair time

(labor) and materials necessary to return a vehicle to its pre-accident condition."

Both the insurers and body shops agree that the databases are the industry standard.

State Farm even assured at least one state insurance regulator that it would begin to

abide by the databases, but still does not.

     This behavior is at least plausibly inconsistent with rational business

behavior—that is, inconsistent with the normal incentive to compete with rivals on

a profitable aspect of quality to gain market share.  *See Starr v. Sony BMG Music*

*Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) ("[I]t would not be in each individual

defendant's self-interest to sell [a product] at prices, and with [certain contract

terms], that were so unpopular as to ensure that 'nobody in their right mind' would

want to purchase [it], unless the defendant's rivals were doing the same.").  For

example, the "Defendants' conduct runs counter to the millions of dollars insurers

spend to gain or maintain market share by advertising 'new car replacement' and

'accident forgiveness' policy terms."  Compl. ¶ 118; *see also* Compl. ¶ 117 (noting

---

[11] The majority's assertion that "the complaints make no factual allegations that the Insurance Companies . . . declined to pay for the same repairs" is simply not true.  *See* Compl. ¶ 68 ("A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit '3.'"); Exhibit 3 (listing repairs); Compl. ¶ 67 ("In many instances, the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring body shops to perform less-than-quality work or suffer a financial loss on a given repair.").

"the incentives insurers have to gain market share by advertising themselves as the insurer that does not cut corners on safety and quality of repair work").

These allegations plausibly suggest an agreement. *See Lifewatch Servs.*, 902 F.3d at 334–35 (holding defendant insurers' identical refusal to reimburse a product that "many sophisticated third parties," including physicians and state medical review boards, agreed was medically necessary was a plus factor); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 49–51 (1st Cir. 2013) (finding a plus factor where defendants acted against their independent interests by uniformly refusing to adopt a policy "standard in the industry" and would have "resulted in a higher volume of customer sales due to the attractiveness of potential savings and environmental benefits").

## 2. Plus Factor: Meeting Often to Discuss Prices

Merely belonging to an industry trade association does not in itself constitute a plus factor. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010). "But we expect competitors to meet together *only minimally* and to *assemble publicly* for relatively *open meetings* conducted with a particular and *justifiable purpose* in mind. To the extent that rivals move away from this model, their activity becomes less consistent with normal competition and more consistent with a conspiracy to suppress it." Areeda & Hovenkamp, *supra*, ¶ 1417b (emphasis added). The body shops allege that insurance industry meetings happen

66

"approximately *once a month*," are *closed* to non-members, and that a State Farm

representative admitted it would discuss with other insurers whether to begin using

third-party reimbursement metrics to set rates.[12]  Compl. ¶ 74 (emphasis added).

State Farm's promise to raise the reimbursement issue at the industry

meeting suggests that State Farm sought the acceptance of the trade association

before adopting database estimates as the method of calculating reimbursement,

and that decisions about the system of calculating rates are made collectively, not

unilaterally by each insurer.  These allegations plausibly suggest a conspiracy to

suppress competition rather than independent and rational "follow the leader"

---

[12] Compl. ¶ 74 (State Farm "assured those present, and the Department of Insurance representative that it would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month"); Compl. ¶ 75 ("The [auto body shop] association representative present for the meeting, John Mosley, invited State Farm to attend those [auto body shop] Association meetings if State Farm would permit members of the Association to attend the insurance meetings.  Mr. Simpkins [the State Farm representative] refused.").  The majority opinion ignores these allegations, instead pointing to the summary paragraph that notes "members of the insurance industry meet regularly to discuss such matters in and amongst themselves."  Compl. ¶ 115.  The majority, disregarding the other related allegations—and thus failing to follow *Twombly*'s directive to view the complaint as a whole—argues that "this statement is so vague as to be useless as support for a conspiracy." Maj. Op. at 33 n.22.
The complaint does not specifically allege whether other defendants attend the "insurance industry meetings" in question.  We do know that "the Insurance Companies account for sixty-five to eighty-five percent of the insurance market in each of the relevant states."  Maj. Op. at 6. It is a reasonable inference that at least some participate in "insurance industry meetings."  But regardless, State Farm's admission is important because it suggests State Farm seeks approval from other insurance industry members on its rate setting mechanism.  That admission—made in front of several witnesses—alone suggests the rate that the insurers uniformly follow is not derived independently by State Farm with the other insurers simply following its lead.  *See* Compl. ¶ 114 (referring to the "concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs"); Compl. ¶ 115 ("Evidence of this conspiracy or combination includes, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves").

activity. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) ("But the Plaintiffs here have done much more than allege 'mere membership.' They have alleged that the member banks *used* the bankcard associations to adopt and enforce a supracompetitive pricing regime for ATM access fees."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (holding plaintiffs plausibly stated a claim for conspiracy when complaint alleged that "defendants belonged to trade association and exchanged price information directly at association meetings"); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47–48 (1st Cir. 2013) (finding plus factor where complaint alleged that defendants attended an industry meeting where two dominant defendants "put forward their position that [adopting a certain policy] was not an option," and the court "could infer that their prominent place in the organization would place some pressure on the other producer defendants to conform with their position"); *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 334 (3d Cir. 2018) (finding plus factor where insurers met several times a year to set model policy terms on the reimbursement of a particular medical device, and the insurers uniformly followed the model policy even though it was not binding them).

The body shops raise more suspicion about these industry meetings by giving an example of how the insurance industry has used similar meetings to suppress competition in this precise way in the past. Allegations of "opportunities

for abuse" are "not to be ignored *when the opportunity is proved to have been utilized in the past.*" *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 796 (1946) (emphasis added); *cf. Williamson Oil Co. v. Phillip Morris U.S.A.*, 346 F.3d 1287 (11th Cir. 2003) (refusing to allow evidence of the defendants' industry's history of antitrust violations at the summary judgment stage because the class had failed to direct it to any precedent holding a history of violations suggests a present violation); Areeda & Hovenkamp, *supra*, ¶1432b (criticizing *Williamson Oil* because "whether a history of past collusion is relevant to likelihood of current collusion is a question of fact, not of law"). The body shops allege—and attach a 1963 consent decree to the complaints to show—that in the past, the auto insurance industry has used trade associations to fix auto body repair costs, including auto body labor, using the same methods alleged here. Compl. ¶¶ 87–89; Exhibit 4 (listing various auto insurer trade associations as defendants).

### 3. Facilitating Factor: Market Structure

Several of our sister circuits have held that allegations showing a market susceptible to collusion, while not alone sufficient, can nudge other factual allegations tending to show an agreement across the line to plausibility. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627–28 (7th Cir. 2010) ("Parallel behavior of a sort anomalous in a competitive market is thus a symptom of price fixing, though standing alone it is not proof of it; and an industry structure

that facilitates collusion constitutes supporting evidence of collusion."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 48 (1st Cir. 2013); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010); *In re Flat Glass Antitrust Litig.*, 384 F.3d 350, 360–61 (3d Cir. 2004) (considering market structure a plus factor for summary judgment analysis pre-*Twombly*).  Market structure susceptible to collusion is not independently a plus factor, but it can place other allegations "in a context that raises a suggestion of preceding agreement."  *Twombly*, 550 U.S. at 557 n.4; *see generally* Areeda & Hovenkamp, *supra*, ¶¶ 2002f(1)–(8) (listing factors that make a market susceptible to collusion including: a small number of firms with large aggregate market share; a fungible service, considered in the context of standardization efforts; few avenues for non-price competition; and high elasticity of supply).

The complaint suggests that at least some of these market factors are present. First, accounting for those entities with common headquarters,[13] roughly a dozen insurers control between 70 and 95 percent of the body shops' revenue.  *See Todd v. Exxon*, 275 F.3d 191, 210 (2d Cir. 2001) (Sotomayor, J.) (finding fourteen defendants that employed 80–90% of industry's workforce sufficient).   Second,

---

[13] For example, the lead complaint lists the headquarters of "GEICO Casualty Company," "Government Employees Insurance Company," and "GEICO Indemnity Company" as the same address in Chevy Chase, Maryland.  Compl. ¶¶ 9–11.

the as the majority seems to recognize, Maj. Op. at 23, the insurers have implemented standardization mechanisms that make comparing their inputs easier—including establishing a quality standard by uniformly refusing to reimburse for the same repairs. *See* Areeda & Hovenkamp, *supra*, ¶ 1435b ("[A]greed steps might be taken to reduce the product or transactional variety that impedes rivals' ability to . . . compare transactions, or to detect 'cheating' from parallel uniformity" such as "agreements standardizing the product . . . or creating formulas for the computation of freight rates or other elements of price"); *Todd*, 275 F.3d at 210 (finding jobs at various firms fungible because "the sophisticated techniques employed by defendants to account for the differences among jobs" made coordinating price possible). Finally, labor is the quintessential example of inelastic supply because "an hour not worked today can never be recovered." *Todd*, 275 F.3d at 211. A plaintiff alleging a per se antitrust violation need not allege anticompetitive harm in a precisely defined market like a plaintiff proceeding under the rule of reason. *See Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 347 (1982) ("We have not wavered in our enforcement of the per se rule against price-fixing."); Areeda & Hovenkamp, *supra*, ¶ 307d2 ("If the claim is made under the per se rule, proof of a relevant market and power are not required by the substantive law and thus need not be pled."). But what we do know from the complaint suggests this market could be susceptible to collusion. While

71

certainly not a plus factor on its own, the market structure facilitates the plausibility of an agreement.

### 4. Facilitating Factor: Exchange of Price Information

Because it allows firms to detect cheating and easily set rates, the apparent exchange of price information between the insurers also facilitates collusion and can also nudge other allegations into plausible claims of an agreement. *See* Areeda & Hovenkamp, *supra*, ¶ 1435a. First, all the insurers charged the same "market rate" as State Farm. Second, only State Farm collects market information from the body shops used to determine that rate. Third, State Farm's rate is artificial, arbitrarily adjusted, and not otherwise derived from actual market information that would be available to all insurers, seemingly ruling out the possibility that each insurer is simply responding to common market stimuli to set its rate. Fourth, the other insurers do not verify the accuracy or validity of State Farm's rate with the body shops. Fifth, the body shops are prohibited from discussing their individual labor rates with each other. And finally, State Farm admitted to discussing a method for setting reimbursement rates at industry meetings.

These allegations lead to two possible explanations. Either the other insurers blindly accept the *body shops' recitation* of *State Farm's rate* without confirming or otherwise discussing that rate with State Farm, or State Farm shares its rate with the other insurers. The latter is at least a reasonable inference from the

allegations in the complaint. This apparent exchange and use of rate information nudges the allegations of an agreement closer to plausibility. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004).

Like standardization, the exchange of rate information is also a facilitating practice because it makes it easier to detect cheating. If an insurer decided to cheat on the agreement by offering a higher price to body shops and purchasing more units of body shop labor, it might drive the actual market rate above State Farm's artificial "market rate." The body shops allege that State Farm collects shop-wide and market-wide rate data and speaks with body shops that report rates it unilaterally considers too high. State Farm's survey could reveal the rate increase occasioned by the cheating insurer, and its conversations with body shops could reveal the offender. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) (market structure that enables cartel members "to be able to detect 'cheating'" facilitates collusion). Again, the exchange of rate information alone does not constitute a plus factor, but it is a well-accepted facilitating practice that can tip other plus factors into suggesting a plausible agreement.

## IV.    Conclusion

None of this is to suggest that any of these plus factors or facilitating factors, standing alone, would allow the plaintiff in another case to survive a motion to dismiss. The plus factor inquiry is wholistic. We cannot analyze each possible

73

plus factor in isolation, accept or reject it, and move on to the next. Instead, we view all the possible plus factors and the allegations that support them in their proper economic context. And only then we decide, whether, viewed as a whole, there is enough to "nudge the claim across the line from conceivable to plausible." *Jacobs*, 626 F.3d at 1333 (internal quotation marks and citations omitted).

Antitrust laws are often underenforced against anticompetitive exercises of buyer market power. And yet, under the majority's interpretation of the *Twombly* standard, never has it been harder for an antitrust plaintiff to proceed to discovery. "The plaintiffs have conducted no discovery. Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Discovery might uncover, for example, that the insurers agreed at industry meetings to use the same market rate, same reimbursement formulas, and same standards of quality. It might reveal exchanges of rate information, attempts to punish cheating insurers, or communications between insurers about successfully maintaining infracompetitive labor rates. And it might not. But "[a]ll that we conclude at this early stage in the litigation is that the . . . complaint provides a sufficiently plausible case of price fixing to warrant allowing the plaintiffs to proceed to discovery." *Id*. Because the majority incorrectly reaches the opposite conclusion, I respectfully dissent.